GAIL SHIFMAN, ESQ., Cal State Bar No. 147334
LAW OFFICE OF GAIL SHIFMAN
2431 Fillmore Street
San Francisco, CA  94115
Telephone:	(415) 551-1500
Facsimile:	(415) 551-1502
Email:	gail@shifmangroup.com

Attorney for Defendant
RICCI LEE WYNNE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　Plaintiff,<br><br>　v.<br><br>RICCI LEE WYNNE,<br><br>　　　Defendant. | CASE NO. CR 19-0120 CRB<br><br>**DEFENDANT'S SENTENCING MEMORANDUM** |

## INTRODUCTION

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States,* 518 U.S. 81, 113 (1996). This is why 18 U.S.C. § 3553(a) requires the Court consider "the nature and circumstances of the offense and the history and characteristics of the defendant," along with what sentence will "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(1) and (2)(D).

1

In determining the sentence, the Court is guided by the principle that it "shall impose a sentence sufficient but not greater than necessary" to meet the goals of sentencing. 18 U.S.C. § 3553(a); *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc).  To do this, the Court must consider the totality of the defendant's life, not just his failures but his successes too.  The Court must ask – who is this person?  How did he come to be here?

## RICCI WYNNE

Most people's minds harbor incompatible ideas about punishment. One is severe: criminals should be punished. The other is sympathetic: there but for God's Grace go I. Punitive passions call for condign punishment. Sympathy calls for compassion. Among those most needing it are people who have lived deeply disadvantaged lives. The criminal law cuts them little slack.

Here, as illustration, is Associate Supreme Court Justice Elena Kagan's description of the life of Evan Miller in *Miller v. Alabama*, 567 U.S. 460 (2012), the decision that declared mandatory life imprisonment without parole for offenders under age 18 unconstitutional:

> [I]f ever a pathological background might have contributed to a 14-year-old's commission of a crime, it is here. Miller's stepfather physically abused him; his alcoholic and drug-addicted mother neglected him; he had been in and out of foster care as a result; and he had tried to kill himself four times, the first when he should have been in kindergarten.

Like Evan Miller, Ricci Wynne's pathological background has contributed to his commission of these crimes.[1]  His mother, Barbra Loza used cocaine (crack and powder) daily throughout her pregnancy.  Ricci tested positive for cocaine and heroin when he was born.  His speech was delayed, and it is not known whether he learned to walk on time because his mother was heavily using drugs at the time.  PSR § 55.  Ricci was physically and verbally abused by his mother, father and uncle

---

[1] The crimes to which Ricci Wynne pled include the possession with intent to distribute 105 grams of cocaine and felon in possession of a firearm for a gun that was in the apartment.  And, while Mr. Wynne has several prior convictions, none are violent offenses, all related to drugs, and the longest sentence received of one year custody.

2

including placing his hands over a hot stove.  He was left alone to try to fend for himself and his basic needs were not always met.  PSR §§ 56 and 57.

He witnessed several instances of violence and drug use including his youngest brother's victimization of Shaken baby syndrome.  He was placed in foster care and throughout his childhood was placed in relative's homes where his uncle would rob banks and his six-year-old cousin was reported kidnapped after his uncle left her with a man whose name he could not remember.  PSR ¶ 60.  The home he was raised in was in a filthy condition and he slept on a mattress with the other children in the middle of a room flooded due to a broken water heater, no food in the fridge or cupboards, littered with needles and flies throughout.  PSR ¶ 59.

Chaos surrounded Ricci's childhood. His father and a female companion were getting high in their apartment, passing out dead in the bathroom with a spoon and needle and a band around her arm, lying in feces all over the floor.  Despite her dying from an overdose, Ricci's father told him to go inside the bathroom to take the woman's fanny pack which had drugs inside of it.  PSR § 62.  Ricci was scared and told his father to call the police which he did after hiding the drugs and fanny pack.  When they arrived, the police asked Ricci for the truth, which he told and when the police eventually let Ricci's father go, he punched Ricci on the side of his head so hard that he had temporarily lost his hearing for three days and required Ricci to clean up the mess that was left in the bathroom from the woman's death.  PSR § 63.

Ricci was the victim of childhood sexual abuse with his father telling him at the age of 13 to have sex with a woman who bought Vicodin from his father.  His father told him that from then on whenever this woman came over to buy drugs, that it was Ricci's responsibility to have sex with her. "Sometimes I didn't want to do it.  I wanted to ride my bike with my friends, but my dad said I had to be there".  This abuse went on for a couple of months.  PSR ¶ 67.

3

The PSR and the Psychological Assessment Report of Dr. Amanda Gregory, attached under seal as Exhibit A, further detail the years of abuse, neglect and trauma that was Ricci Wynne's childhood. Ricci has attempted suicide three times including while in custody in January 2019 following his arrest on these charges. He was placed on a 5150 hold and subsequently released back to the jail.

Dr. Gregory diagnosed Ricci with Neurodevelopmental Disorder associated with prenatal exposure to cocaine, heroin, and valium (with learning disabilities, executive dysfunction, and impaired processing speed and attention/working memory); other specified depressive disorder; borderline and antisocial personality characteristics; stimulant (cocaine) use disorder severe; opiate (heroin) use disorder moderate; and alcohol use disorder, moderate.

Dr. Gregory found that Ricci's self-concept is poorly established and his attitude about himself fluctuates, depending on his relationships. His self-esteem appears "fragile and likely to plummet following slights or oversights from others." These are likely areas of particular concern for him and include "problems with alcohol and drug use, suspiciousness, sensation seeking behavior, impulsivity, anger issues, interpersonal sensitivity, feelings of helplessness, tension and apprehension, antisocial behavior (impulsive, illegal and irresponsible behavior), borderline personality features (emotional lability, little sense of himself, a history of volatile relationships and failures in close relationships, preoccupation with being abandoned, impulsive self-harm behaviors), moodiness, and disruptions in thought processes. Notable depressive features are also apparent including sadness, feelings of worthlessness, hopelessness, sleep problems and low energy. His substance misuse likely plays a functional role in helping him withdraw from his problems and relationships."

In addition, Ricci is learned disabled performing in the low/borderline range in several areas. He comprehends reading at a fourth-grade level. On spelling, he performs in the extremely low range. His executive functioning is in the extremely low range (below the 1st percentile.) The Psychological Assessment Report detail a man struggling and functioning at a low to extremely low range.

4

Dr. Gregory found that Ricci acknowledges that he has significant problems for which he needs help and has substantial interest in receiving treatment and making changes in his life. His combination of issues suggests that treatment is likely to be challenging and that if he does enter treatment, that his difficulties in his social support system suggest that impasses in the treatment relationship should be handled with particular care.

Ricci's disadvantage calls for compassion which the PSR supports. With Ricci's childhood trauma, cognitive and learning deficits and neurodevelopmental issues and substance abuse issues, the PSR recommends a variance under §3553 which the defense joins. The defense, however, asks for a sentence of time served which is now 29 months.[2] This sentence is more than double any previous sentence that Ricci has served and would allow him to go into residential drug treatment at New Bridge Foundation in Berkeley.

The defense has been advised that Probation would have to place Mr. Wynne on a waiting list for residential treatment which means that if he received a time served sentence he would not immediately go into residential treatment. Thus, it is suggested that the Court permit Ricci to be placed on pretrial release which would allow for his release from custody into immediate placement at the New Bridge program. To accomplish this, Defendant asks that his sentence be continued. This would also permit the sentencing to hang over Mr. Wynne's head as a further incentive to his successful completion of the residential drug treatment program.[3] [4]

**MR. WYNNE'S BACKGROUND- §3553(a) FACTORS LEADING TO A VARIANCE**

---

[2] Defendant asks that the PSR be amended in the Release Status section on page 2 to reflect that he has been in custody on these offenses since January 10, 2019, when he was arrested by the SFPD.

[3] It is noted that Pretrial Services continues to state that Ricci is a danger to the community though he has never been convicted of a violent offense. Despite this, Defendant asserts he is not a danger to the community.

[4] Remarkably, the government coldly suggests a guidelines sentence is appropriate missing application of all the sentencing factors that the Court must consider. That their sentencing memorandum is blind to Ricci Wynne's background, including his diagnoses is appalling. Such a bureaucratic approach to sentencing suggests that the government is out-of-touch with the statutory purposes of sentencing and their recommendation disregarded.

5

The PSR and the defense agree that a variance under 18 U.S.C. §3553(a) is appropriate given the personal history of Mr. Wynne and other factors that the Court must consider in determining an appropriate sentence. *See United States v. Booker*, 543 U.S. 220 (2005). In this case, these factors indicate that the agreed-upon sentence between the parties is sufficient, but not greater than necessary, to achieve the goals of sentencing. *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008).

**1. Chaotic and Disadvantaged Childhood and Lack of Guidance as a Youth**

Disadvantaged childhood and lack of guidance as a youth are factors that district courts are free to consider under *Booker* and its progeny as part of the § 3553(a) analysis. *See United States v. Ruiz*, 2009 WL 636543 (S.D.N.Y. March 11, 2009) (judge imposed 96 months rather than guideline range 140-175 months for crack offenses in part due to defendant's difficult childhood with abusive mother and largely absent father who was incarcerated and a heroin addict); *United States v. Patzer*, 548 F.Supp.2d 612 (N.D. Ill. 2008) (court imposed sentence of 13 years, despite Guidelines range of 346-411 months, finding that defendant's prior offenses designating him as a career offender were less serious than most of such offenses considered for purposes of that guideline, had difficult childhood, not property diagnosed with ADD, his conduct stemmed from mental health and drug problems that were treatable, and that he had potential for rehabilitation with support of friends and foster family).

**2. Consideration of Youth and Immaturity**

Youth and immaturity during the commission of an offense is a factor which may be considered under Section 3553(a) and as directed by *Gall v. United States*, *supra*, 128 S.Ct. at 593, 601. *See also Roper v. Simmons*, 125 S. Ct. 1183 (2005) ("today our society views juveniles, in the words *Atkins* used respecting the mentally retarded, as categorically less culpable than the average criminal . . . A lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions . . . The relevance of youth as a mitigating factor derives from the fact

6

that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside."); *United States v. Montanez*, 2007 WL 2318527 (E.D. Wis. Aug 9, 2007) (court departed based on overstated criminal history, good prison conduct, and noticeable increase in maturity).

Here, while Ricci Wynne is not young by his years, he is immature based upon his mental capacities, and as a result acts as a young person does. He has, however, spent the last 29 months in custody maturing, reflecting on his behavior, his need for guidance and help, and his deep desire for change.

**3. Needed Drug Treatment in the Most Effective Manner: Drug Rehabilitation Reduces Recidivism**

Mr. Wynne has been abusing substances since he was a young teenager. He has the foresight to understand that his drug use has greatly affected his relationships with family, and friends. Drugs helped him manage the trauma and difficulties he was surrounded with, while at the same time creating situations that led him to these offenses.

It is well-established that people addicted to drugs need treatment, help, and a support system to fully break the addiction. Moreover, the recidivism rate is less for drug offenders who receive treatment while in prison or jail, and still less for those treated outside of a prison setting. Lisa Rosenblum, *Mandating Effective Treatment for Drug Offenders*, 53 Hastings L.J. 1217, 1220 (2002); *see also United States v. Perella*, 273 F.Supp.2d 162, 164 (D. Mass. 2003) (observing that if drug addiction creates a propensity to crime, drug rehabilitation goes a long way in preventing recidivism).

**4.   Double Counting – the Guidelines are Increased Based on the Same Conduct**

The base offense level is increased for Mr. Wynne because he committed the offense subsequent to sustaining at least two controlled substance offenses. PSR ¶ 21. These same two prior controlled substance offenses serve as the sole basis for the application of the career offender guidelines. PSR ¶ 28.

7

The plain language of the guidelines does not support double counting enhancements. The guidelines sections that define offense levels and that adjust offense levels merely delineate conduct that requires imposition of enhancements. They do not discuss interplay between these mechanisms. Likewise, the application instructions lay out the steps to follow in determining a sentence range, but do not provide a guide to resolving conflicts among the steps. There is no language in the guidelines to support the cumulative application of enhancements.

As with the plain-language inquiry, the structure of the sentencing guidelines does not support double counting. The guidelines' language does not present an overarching theme indicative of the Commission's intent to allow double counting. Nor do the guidelines provide a list of permissible or prohibited areas of cumulative punishment from which to extrapolate that the Commission permits double counting.

As with the language and structure of the guidelines, legislative intent does not support double counting. The key indicator of Congress' intent is the Senate report outlining the findings supporting the Sentencing Reform Act.[5] In this report Congress found that in preguidelines sentencing judges had too little regard for the relative seriousness of offenses. The report shows that Congress found sentences that are too severe in relation to others create unnecessary tension among inmates, leading to discipline problems in prison. Congress' goal was to create a system of ranked seriousness that the guidelines embody. It intended to treat categories of offenders consistently without resorting to narrow sentencing statutes. It also sought to eliminate problems created by offenders who might fall into more than one category. Congress did not, however, call for more severe sentences.

These findings do not show that Congress intended for sentence enhancements to apply cumulatively for the same conduct. Instead, they show that a primary concern was for proportional sentences with- out over-punishing. The legislative history of the Sentencing Reform Act, therefore,

---

[5] S. REP. No. 225, *supra* note 3, at 38, *reprinted in* 1984 U.S.C.C.A.N. at 3221.

does not support double counting. Instead, it, suggests that Congress did not intend such cumulative punishment.

Double counting defeats the congressional goal to create a sentencing system that promotes proportionality in sentencing. While the Court may find the guideline enhancements applicable to Mr. Wynne, it can also find and acknowledge that there is a double counting based upon the same exact conduct and adjust the sentence imposed by varying downward under § 3553 for this reason.

## THE APPLICABLE SENTENCING GUIDELINES

Defendant agrees with the PSR that Counts 1 and 2 are grouped for guideline calculation purposes though the plea agreement misapplied the guidelines.  However, it appears that the four-level enhancement for possession of the firearm in connection with another felony offense is not applicable. PSR § 23. For the four-level enhancement to apply, the government "must show that the firearm was possessed in a manner that permits an inference that it facilitated or potentially facilitated — *i.e*, had some potential emboldening role in — a defendant's felonious conduct." *United States v. Routon*, 25 F.3d 815, 819 (9th Cir. 1994). *See United States v. Polanco*, 93 F.3d 555, 565–66 (9th Cir. 1996) (requiring "proof of a 'connection' between the use or possession of the firearm and the underlying offense"). *See United States v. Noster*, 590 F.3d 624, 635 (9th Cir. 2009) (explaining that "[t]he government bears the burden of producing sufficient evidence that the defendant intended to use or possessed the firearm in connection with a specifically contemplated felony"); *Bishop*, 940 F.3d at 1252 (holding "that mere proximity between a firearm and drugs possessed for personal use cannot support the § 2K2.1(b)(6)(B) enhancement without a finding that the gun facilitated or had the potential to facilitate the defendant's drug possession"); *United States v. Grimaldo,* 984 F.3d 876 (9th Cir. 2021).

Here, there is no evidence to suggest that the possession of the firearm facilitated the commission of the possession with intent to distribute drugs.  For this reason, this enhancement is not applicable in this case.

9

**CONCLUSION**

In full consideration of Mr. Wynne's history and characteristics together with the goals of sentencing, Defendant urges the Court to sentence him to time served with immediate placement into residential drug treatment at New Bridge where he has been accepted. To impose this sentence, Mr. Wynne requests that the Court continue his sentencing, placing him on pretrial release to New Bridge.

Dated: June 8, 2021                                             Respectfully submitted,

                                                        /s/ Gail Shifman

GAIL SHIFMAN
Attorney for Defendant
RICCI LEE WYNNE